IN THE SUPREME COURT
OF THE VIRGIN ISLANDS

**FILED**
March 27, 2024 01:55 PM
SCT-CRIM-2020-0009
**VERONICA HANDY, ESQUIRE**
**CLERK OF THE COURT**

**FOR PUBLICATION**

## IN THE SUPREME COURT OF THE VIRGIN ISLANDS

QUANZA HEATH,　　　　　　　　　　　)　　**S. Ct. Crim. No. 2020-0009**
　　　Appellant/Defendant,　　　　　　　)　　Re: Super. Ct. SX-15-CR 384 (STX)
　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
**PEOPLE OF THE VIRGIN ISLANDS**　　)
　　　Appellee/Plaintiff.　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)

On Appeal from the Superior Court of the Virgin Islands
Division of St. Croix
Superior Court Judge: Hon. Robert A. Molloy

Considered: March 9, 2021
Filed: March 27, 2024

Cite as: 2024 VI 17

**BEFORE:**　　**RHYS S. HODGE**, Chief Justice; **MARIA M. CABRET**, Associate Justice; and **IVE ARLINGTON SWAN**, Associate Justice.

**APPEARANCES:**

**Martial A. Webster, Sr., Esq.**
**Law Office of Martial A. Webster, Sr.**
St. Croix, U.S.V.I.
　　*Attorney for Appellant,*

**Ian S. A. Clement, Esq.**
Assistant Attorney General
St. Thomas, U.S.V.I.
　　*Attorney for Appellee.*

## OPINION OF THE COURT

**SWAN, Associate Justice.**

¶1　　Appellant Quanza Heath ("Heath") appeals from the Superior Court's January 24, 2020,

judgment and commitment, which convicted him of five counts of unauthorized possession of a firearm, in violation of 14 V.I.C. § 2253(a), five counts of possession of ammunition, in violation of 14 V.I.C. § 2256(a), and one count of failure to report firearms obtained outside or brought into the Virgin Islands, in violation of 23 V.I.C. § 470(a). For the reasons elucidated below, we affirm the Superior Court's January 24, 2020 judgment and commitment.

## I.    FACTUAL BACKGROUND AND PROCEDURAL POSTURE

¶2    In 2015, Heath was under house arrest, having been granted pretrial release in February of 2014 and ordered to reside at No. 176 Estate Hannah's Rest, Frederiksted, St. Croix while he awaited trial on criminal charges resulting from his unlawful possession of a firearm in violation of 14 V.I.C. § 2253(a), possession or sale of ammunition in violation of 14 V.I.C. § 2256(a), failure to report firearms obtained or brought into the Virgin Islands in violation of 23 V.I.C. § 470(a), carrying or using a deadly weapon in violation of 14 V.I.C. § 2251(a)(1) and delaying and obstructing an officer in discharge of his lawful duty in violation of 14 V.I.C. § 1508. His pretrial release was subject to many conditions, including 24-hour GPS electronic monitoring under the supervision of a third-party custodian, David Hodge, who is Heath's grandfather.

¶3    During that year, the Virgin Islands Police ("VIPD") and the Virgin Islands Superior Court Marshal Division ("Marshal Division") commenced a joint operation called Operation Curfew. Operation Curfew was created to assist the Marshal in conducting inspections on individuals under house arrest and curfew and on pre-trial release by the court pending commencement of trial. Inspections were coordinated due to manpower limitations and an increase in violations of pretrial release during the Christmas and Carnival seasons.

¶4    On December 19, 2015, sometime between 9:00 and 10:00 p.m., members of Operation Curfew arrived at Heath's residence. VIPD Officer Melissa Fraser-Jacobs ("Fraser-Jacobs")

testified that VIPD Lieutenant Robert Matthews ("Matthews"), her supervisor, and Marshal Chris Richardson ("Richardson") arrived at Heath's residence and knocked on the front door. Richardson testified that he saw lights on in the house when they arrived and that he identified himself as a marshal when he knocked on the door. Fraser-Jacobs and Richardson testified that after Matthews and Richardson knocked on the front door of the residence there was considerable delay before a response came from inside—which according to Richardson—was confounding because his GPS equipment was accurate, and it confirmed that Heath was inside his residence. This tardy response also prompted the officers engaging in the operation to position themselves strategically near the front of the house for their safety.

¶5     The evidence presented at the suppression hearing was that, at the time that Matthews and Richardson were knocking at the front door of the residence, Fraser-Jacobs testified that she heard noise coming from behind the house and that she could see a light in the house. She testified that Matthews instructed her to go to the rear of the residence to contact anyone in the house. Fraser-Jacob testified that she proceeded to the back of the residence and saw over 100 marijuana plants in plain view. Additionally, she testified that she also noticed movement inside the house before she returned to the front of the house and that she relayed this information to the other members of Operation Curfew who were then on the scene.

¶6     After some delay, Winston Berkley ("Berkley"), who is the defendant's uncle and who had been residing at 176 Estate Hannah's Rest with the defendant since 2009, opened the front door and spoke to Matthews and Detective Kai Joseph ("Joseph"), who had just recently arrived along with Detective Darryl Walcot ("Walcott"). Richardson, Walcott, and Joseph, each testified that Berkley told Matthews that he was an owner of the residence, and Richardson and Joseph further testified that Berkley also told Matthews that Berkley was Heath's third-party custodian. Joseph

further testified that Berkley gave law enforcement officials oral consent to search the residence, and Richardson, Walcott, and Joseph each testified that Berkley signed a consent to search form authorizing law enforcement officers to enter and search the residence. Detective Walcott then entered the residence through the front door and commenced searching inside. Richardson also entered the residence, spoke to Heath, and examined his GPS monitoring unit. Heath's sister, Keisha Heath, and her children, who were visiting for the Christmas holiday, were also present in the residence. Detective Walcott asked Heath which room was his, and Heath pointed to one of the rooms and said, "go ahead and search it." (J.A. 216.) In that room, Detective Walcott found only women's clothing and concluded that the room contained no personal items indicating that Heath was occupying that room.

¶7     Walcott testified that during the search he smelled a strong odor of marijuana and noticed from where he was standing in the common hallway that a bag with marijuana was on a table in another bedroom. When Walcott inquired about the occupancy of the room with the bag of marijuana on the table, Heath informed him that he did not know whose room it is but that he had just smoked a "joint." (J.A. 220.) Walcott searched the room containing the marijuana and found a handgun, a magnum revolver and a semi-automatic M12 gun, under the mattress, with more than 15 live rounds inside the attached extended magazine. The revolver contained one live round in the chamber of the cylinder, aligned with the barrel and five more in the remaining slots of the cylinder. The other handgun contained seven live rounds in the magazine. Walcott also found live rounds inside a plastic bag and a box of ammunition on top of the closet in that same bedroom.

¶8     Walcott also searched a third bedroom adjacent to this room, which no one claimed to occupy. Many items were assembled on the bed in this room and Walcott's search revealed a semi-automatic assault rifle, a bullet proof vest and a rifle scope resting underneath the mattress

along with a shotgun with eight live rounds and another bullet-proof vest in the closet.

¶9     Law enforcement officials seized the items and arrested Heath and Berkley and transported them to the police precinct, where law enforcement officers advised them of their Miranda rights. Heath declined to waive his right to remain silent and refused to sign his advice of rights form. While Joseph was transporting Heath to the Bureau of Corrections ("BOC"), Heath spontaneously asked Joseph whether his sister who was visiting at his residence would be involved. Joseph responded to Heath informing him that his sister would be interviewed as part of the ongoing investigation. In response, Heath volunteered that he did not want his sister to be involved and that the contraband belonged to him and Berkley. Heath agreed to provide a written statement during his trip to the BOC.

¶10     The People filed an information on January 11, 2016, charging Berkley with maintaining or operating a controlled substance production facility, and simultaneously charging Heath with unauthorized possession of a firearm, unauthorized possession of ammunition, failure to report firearms obtained outside or brought into the Virgin Islands, and other related charges.

¶11     A jury trial in the Superior Court commenced on August 19, 2019 and terminated on August 21, 2019. At the end of the trial, the jury rendered unanimous verdicts of guilty on all 11 counts in the amended information. Heath timely perfected an appeal to this Court on January 30, 2020, and this appeal ensued. *See* V.I. R. APP. P. 5(a)(1).

## II.     JURISDICTION

¶12     Title 4, section 32(a) of the Virgin Islands Code vests the Supreme Court of the Virgin Islands with jurisdiction over "all appeals arising from final judgments, final decrees, [and] final orders of the Superior Court." The Superior Court's January 24, 2020 judgment and commitment constitutes a final judgment within the meaning of section 32(a), thereby conferring jurisdiction

on this Court. *Joseph v. Daily News Publishing Co., Inc.*, 57 V.I. 566, 578 (V.I. 2012).

## III. STANDARD OF REVIEW

¶13    In reviewing the Superior Court's denial of Heath's motion to suppress, we review its factual findings for clear error and exercise plenary review over its legal determinations. *Simmonds v. People*, 53 V.I. 549, 555 (V.I. 2010). We also exercise plenary review over the Superior Court's application of law with regard to the other issues that Heath raises in this appeal, including the sufficiency of the evidence. *Allen v. HOVENSA, L.L.C.*, 59 V.I. 430, 436 (V.I. 2013) (citing *St. Thomas-St. John Bd. of Elections v. Daniel*, 49 V.I. 322, 329 (V.I. 2007)), *Brathwaite v. People*, 60 V.I. 419, 426 (V.I. 2014).

## IV. DISCUSSION

¶14    Heath seeks reversal of his convictions, while propounding a multifaceted argument claiming (1) that the Superior Court erred in denying his motion to suppress; (2) that the evidence was insufficient to support any of his convictions and (3) that the Superior Court erred when it denied his motion to dismiss the case for violating his rights to a speedy trial. (Appellant's Br. 18-34). We address these issues in turn.

### 1. SUPPRESSION MOTION

#### a. *The Knock and Talk Exception to the Warrant Requirement*

¶15    Heath posits that Virgin Islands law enforcement officials repeatedly violated his Fourth Amendment rights and, accordingly, that the Superior Court erred when it denied his motion to suppress evidence seized at his residence. Heath asserts that the presence and conduct of Virgin Islands law enforcement officers at his residence were unlawful and constituted a seizure because the officers lacked probable cause to support a search, thus rendering the warrantless search unreasonable *per se*. (Appellant's Br. 18-30.) The People counter Heath's assertions, arguing that

the Superior Court properly applied the relevant law with no clear error and that the court's determination to deny Heath's motion to suppress was correct.[1] (Appellee's Br. 20-32.)

¶16 The Fourth Amendment of the Constitution, applicable to the U.S. Virgin Islands pursuant to Section 3 of the Revised Organic Act of 1954 as amended,[2] generally protects people in their homes and curtilage[3] from unreasonable governmental intrusion. *Blyden v. People*, 53 V.I. 637, 648 (V.I. 2010). A warrantless search or seizure of a person's residence or home is therefore *per se* unreasonable, absent the applicability of any exceptions to the rule. *Thomas v. People*, 63 V.I. 595, 605 (V.I. 2015) (citing *Brown v People*, 56 V.I. 207, 217 (V.I. 2012)); *see also, City of Los Angeles v. Patel*, 576 U.S. 409, 410 (2015), *Arizona v. Grant*, 556 U.S. 332, 338 (2009).

¶17 Among the exceptions to the warrant requirement, courts have generally recognized a "knock and talk" exception. *Estate of Smith v. Marasco*, 318 F.3d 497, 519 (3rd Cir. 2003), *see*

---

[1] Heath argued to the Superior Court that "[o]ne who has been released on pre-trial bail," such as himself, "does not lose his Fourth Amendment right to be free of unreasonable search and seizure," and "neither does he waive his Fourth Amendment rights by agreeing, as a condition of bail, to submit his person and property to search at any time upon request by a law enforcement officer." (J.A. 88-89; 98). As a result, Heath concluded that "[a]ny search made pursuant to th[at] condition . . . must necessarily meet the Fourth Amendment's standard of reasonableness," citing to *United States v. Scott*, 450 F3d 863 (9th Cir. 2006) as support. (*Id.*). He repeats this argument on appeal, again citing to *Scott* as support. (Appellant Br. 21). In response, the People distinguish *Scott*, observing that in that case, "law enforcement needed probable cause to issue a drug test to [a] defendant released on bail," while in Heath's case, "the police needed only a legitimate reason to knock on Heath's front door," and "[a]s the Superior Court found, Operation Curfew" and its purpose to ascertain and ensure arrestees' compliance with their conditions of pre-trial release, "was that legitimate reason." (Appellee's Br. 23). As an alternative justification for law enforcement's actions, the People represent that "as a condition of Heath's house arrest, the Marshal's Office and/or the VIPD were entitled to knock on Heath's front door to ensure that he was complying with the conditions of his house arrest and [they] were not required to articulate any suspicion that he was not in compliance." (*Id.*). Assuming without deciding that the reasonableness requirement of the Fourth Amendment applies notwithstanding an arrestee's express agreement, as a condition of his or her release on bail to house arrest, to submit his person and property to warrantless search at any time upon request by a law enforcement officer, that requirement was satisfied by the law enforcement officers and marshals involved in the instant case.

[2] *See* 48 U.S.C. § 1561. *See also* The complete Revised Organic Act of 1954 is found at 48 U.S.C. §§ 1541-1645 (1995); *reprinted in* V.I. CODE ANN. Historical Documents, Organic Acts, and U.S. Constitution at 73–177 (1995 & Supp. 2003) (preceding V.I. CODE ANN. tit. 1).

[3] *See Simmonds v. Virgin Islands*, 53 V.I. 549, 556 (V.I. 2010) (noting that curtilage is the area around the home to which the activity of home life extends, and that people have a legitimate expectation of privacy within this area.)

*also Rogers v. Pendelton*, 249 F.3d 279, 289-90 (4th Cir. 2001). Consistent with the Fourth Amendment, the knock and talk exception authorizes law enforcement officers to approach an individual's front door to inform the individual of their presence, ask questions or investigate matters, and seek consent of the occupants to search the residence or property. *United States v. Wells*, 648 F.3d 671, 679 (8th Cir. 2011); *see also, United States v. Weston*, 443 F.3d 661, 667 (8th Cir. 2006). Courts have recognized two justifications for this rule. The first is that "homeowners or occupants of a residence do not have an expectation of privacy in areas generally made accessible to visitors, including but not limited to, entrance ways such as a driveway, a walkway or a passageway." *See Wells*, 648 F.3d at 679; *United States v. Reed*, 733 F.2d 492, 501 (8th Cir. 1984). "These are simply not areas in which a person can reasonably maintain any expectation of privacy." *Wells*, 648, F.3d at 679; *see also United States v. Maestas*, 639 F.3d 1032, 1036-37 (10th Cir. 2011). The second justification is that homeowners grant members of the visiting public such as "mail carriers, sanitation workers [and] neighbors . . . to name a few" an "implied consent to enter these areas for those purposes that accompany the normal interaction of a social, civilized society." *Wells*, 648 F.3d at 679 (citing *United States. v. Simms*, 606 F.3d 966, 969-71 (7th Cir. 2010)). Accordingly, "absent a clear expression by the owner [of a residence] to the contrary, police officers are permitted to approach a dwelling and seek permission to question an occupant in the course of their official business." *Gompf v. State*, 120 P.3d 980, 986 (Wyo. 2005) (listing cases). Importantly, for law enforcement officers to avail themselves of the knock and talk justification, both their initial entry onto the property and their conduct within the property must be reasonable, that is, the circumstances must not objectively indicate that law enforcement officers' purpose was to initiate a warrantless search instead of engaging the inhabitants. *See Florida v. Jardines*, 569, U.S. 1, 8-9, 21 (2013) (observing that "[t[he scope of a license—express

or implied—is limited not only to a particular area but also to a specific purpose," and that while "the background social norms that invite a visitor to the front door do not invite him there to conduct a search," it is nevertheless permissible for "a police officer not armed with a warrant [to] approach a home and knock [on the door], precisely because that is 'no more than any private citizen might do,'" and that in doing so, police may "seek[ ] to speak to an occupant for the purpose of gathering evidence") (citing *Kentucky v. King*, 563 U.S. 452, 469 (2011)).

¶18     Here, the undisputed testimony is that on December 19, 2015, Virgin Islands police officers and officers from the Marshal Division conducted "Operation Curfew," for the purpose of assisting the Marshals in conducting checks of individuals placed on pretrial release by the Superior Court in pending criminal matters, which included individuals under house arrest and curfew, such as Heath.  Operation Curfew was memorialized in an official memorandum consummated among government agencies, via an informational briefing which contained a defined list of locations that were under the supervision of the Marshal Division and articulated a proper government purpose— specifically, decreasing crime during the Christmas and Carnival seasons.

¶19     It is likewise undisputed that on December 19, 2015, Heath was on pretrial release pursuant to an order of the Superior Court, pending his trial on criminal charges related to the unlawful possession of a firearm.  In this order, David Hodge, who is Heath's grandfather and a resident of 176 Estate Hannah's Rest, Frederiksted, St. Croix, was required to agree to act as Heath's third-party custodian.  The Superior Court's order also imposed several other requirements.  Among these were that Heath must reside at the same 176 Estate Hannah's Rest address with a working telephone number through which he could be contacted; that Heath was to immediately notify the Superior Court if there was a change of his address or his telephone number; that Heath should be placed under house arrest with 24-hour GPS electronic monitoring; and that Heath shall not violate

the laws of the Virgin Islands or of the United States; and other conditions. (See Superior Court Pretrial Release Order dated February 7, 2014.)

¶20 It is undisputed that law enforcement officers did not approach Heath's residence on December 19, 2015, in the late evening, between nine and ten o'clock, with a warrant. Instead, they approached Heath's residence to conduct a compliance check on Heath, consistent with Operation Curfew, which was executed to monitor house arrest compliance and to decrease crime during the Carnival and Christmas seasons. Operation Curfew involved a legitimate Virgin Islands government and law enforcement objective. A review of the marshals' and law enforcement officers' conduct upon their arrival at Heath's residence reveals that they first attempted to contact Heath at the front door of his residence. Officer Melissa Fraser-Jacobs, Lieutenant Robert Matthew, and Marshal Chris Richardson approached the front door of the residence. Matthew and Richardson knocked on the front door for an extended period, encompassing three to five minutes, during which Richardson identified himself as being from the Marshal Division. Marshal Richardson testified that he was puzzled by this delay because the GPS tracker, which was accurate to within approximately 100 feet, disclosed that Heath was inside his residence. There is no dispute, or any evidence presented in the trial record which indicates, that the Virgin Islands law enforcement officers acted in an intimidating or coercive manner or brandished their weapons while at Heath's residence. Because Virgin Islands law enforcement officers were present at Heath's residence to perform a compliance check by first knocking on the front door and their subsequent conduct in going to the back of the property to see if contact with Heath could be made, there was a reasonable limited intrusion for legitimate law enforcement objectives, and we therefore reject Heath's argument that law enforcement officials were unlawfully on his property.

### b. *The Consent Exception to the Warrantless Search*

¶21    Heath argues that he never gave consent to search his room or the house and that he was the subject of an illegal search and seizure. (Appellant's Br. 23-26.)   Heath also argues that Berkley's consent was defective, that the search was conducted before Berkley gave consent, that law enforcement officers persuaded Berkley to sign the written consent to search form and that Berkley did not know what he was doing.   (App's Br. 25.)   Heath further argues that Berkley did not have authority over the entire house; therefore, he could not give consent. (Appellant's Br. 25.).   The People oppose Heath's assertion, arguing that Berkley's consent to search the house was knowing and voluntary and that Berkley had apparent authority to consent to law enforcement's search of the residence. (Appellee's Br. 33-37.)

### i. *Berkley freely and voluntarily gave VIPD Officers verbal and written consent to search the residence at 176 Hannah's Rest.*

¶22    A person's consent to search is a valid authorized exception to the warrant requirement under the Fourth Amendment. *Thomas v. People*, 63 V.I. 595, 607 (V.I. 2015) (quoting *Simmonds*, 53 V.I. at 559-60); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).   "If a person gives free and voluntary consent to search, a warrantless search is considered constitutionally valid and whether consent was freely and voluntarily given is determined by looking at the totality of the circumstances surrounding the consent." *Thomas*, 63 V.I. at 607 (citing *Schneckloth*, 412 U.S. at 227); *see also United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011) (noting that the factors considered in determining whether consent was given voluntarily include the age, intelligence and education of the individual giving consent, whether the individual understood the right to refuse to consent to search, and whether the individual understood his rights).

¶23    Berkley's oral and written consent for VIPD officers to search the residence at 176

Hannah's Rest was freely and voluntarily given. The record reveals that Berkley, after some delay, opened the front door and spoke to Matthews and Marshal Richardson. The record further establishes that multiple participants in Operation Curfew who were present at the residence testified that Berkley represented to Matthews, in response to Matthews' inquires, that he was Heath's third party-custodian and that he was one of the owners of the residence. Marshal Richardson, as well as Detectives Walcott and Joseph, likewise testified that Berkley gave consent to search the residence and further signed a consent to search form, which was attested by two witnesses. Detective Joseph's testimony at trial supported Marshal Richardson's testimonial evidence that Berkley consented to the search orally and in writing. Both detectives testified that Berkley understood that he was consenting to the search of the residence where he was located, and there is no evidence in the record which suggests that Berkley did not understand that he was consenting to the search of his residence. Heath's argument that the VIPD search was conducted before Berkley gave consent, that law enforcement officers persuaded Berkley to sign the written consent to search the residence, and that Berkley did not know what he was doing is not substantiated by any evidence in the record. The record demonstrates that in the brief exchange Berkley had with law enforcement officers before he gave them oral and written consent to search the house, he was intelligent, cooperative, responsive, and understood that a VIPD law enforcement official was seeking his consent to search the house where he was residing. Further, contrary to Heath's argument that Berkley's consent resulted from coercion, law enforcement officers did not threaten Berkley or use any type of force during their encounter with him. No evidence exists that law enforcement officers used the discovery of the marijuana in the backyard to coerce Berkley to provide consent for them to search the residence. Berkley provided oral consent to search the house and no evidence was presented that Berkley was confused or

misunderstood the officers' directives during the encounter. Rather, law enforcement officers testified that Berkley fully understood that they wanted to search the house in which he resided. Based on the totality of the circumstances surrounding the consent, Berkley gave free and voluntary consent to search the residence at 176 Hannah's Rest. More succinctly, the evidence in the court's record substantiates that upon the officers' arrival at Heath's residence, they knocked on the front door and waited for several minutes for a response. Berkley eventually responded to the door, acknowledged the officers, represented to them that he was Heath's third-party custodian and that he was one of the owners of the residence at 176 Hannah's Rest, signed a consent to search form, and additionally gave the officers oral consent to search the residence. Berkley's representation indicated that, at a minimum, he had apparent authority over the residence to consent to its search. Accordingly, there was no violation of Heath's Fourth Amendment rights when the officers received a valid consent to enter his residence.

¶24     Heath also argues that Berkley did not have authority over the entire house; therefore, he could not give consent to search the residence. However, on the present record, this contention is meritless.

¶25     As the Supreme Court of the United States has held, "permission to search [may be] obtained from a third party who possesse[s] common authority over[,] or other sufficient relationship to[,] the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171 (1974). However, this conclusion "does not suggest that law enforcement officers may always [blindly] accept a person's invitation to enter premises" that are occupied. *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990). Instead, as the Court explains in *Rodriguez*,

>     Even when the invitation is accompanied by an explicit assertion that the
>     person [giving the invitation to enter and search] lives there, the surrounding
>     circumstances could conceivably be such that a reasonable person would

doubt its truth and not act upon it without further inquiry. As with other factual determinations bearing upon search and seizure, determination of consent to enter [and search] must be judged against an objective standard: would the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had [apparent] authority over the premises? If not, then warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid.

497 U.S. at 188-89 (quoting *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)) (internal quotation marks and alterations omitted). In other words, "[t]he test for determining common authority or other sufficient relationship to the premises or effect to be searched focuses on apparent authority rather than actual authority[; t]hus, if it reasonably appear[s to the police] that a third party ha[s] common authority over the premises, then the [third party's] consent to search would be valid." *State v. Castaneda*, 724 P.2d 1, 8 (Ariz. 1986) (citing *Matlock*, 415 U.S. at 171 & n.7).

¶26    Here, the record informs that Berkley affirmatively represented that he was one of the owners of the residence at 176 Estate Hannah's Rest and that he was Heath's third-party custodian. It likewise indicates that law enforcement's reliance on these representations was objectively reasonable. Since Heath was under house arrest, it is rational to expect that his third-party custodian would be at the residence with him, and Berkley was the only other adult in the residence at the time besides Heath's sister, who was not then residing at 176 Estate Hannah's Rest but only visiting for the Christmas holiday with her minor children. In addition, the record further informs that after Berkley freely and voluntarily gave VIPD Marshals consent to search the residence, including its common areas, Heath further gave VIPD Marshals consent to search the room that he admitted was his room after the VIPD Marshals were inside the residence and talking to him.

### c. The Plain View doctrine applies to the Marijuana Plants Seized on the Property and the Illegal Firearms and Contraband Found Inside his Residence.

¶27    Heath argues that law enforcement officers conducted a search of the yard and discovered

the marijuana plants before Berkley gave consent to search the residence. (Appellant's Br. 23.) The People argue in opposition that law enforcement officers were traversing the yard area of the house to contact Heath and that they were not searching for evidence of a crime. Therefore, the discovery of the marijuana plants in the yard was inadvertent and incidental to their legitimate attempt to contact Heath. (Appellee's Br. 32.)

¶28 The plain view exception authorizes a law enforcement officer to "make a warrantless seizure of items that he or she viewed from a place or position in which he or she was lawfully entitled to be, provided it is immediately apparent that the item observed is evidence of a crime, contraband, or otherwise subject to seizure." *Gumbs v. People*, 64 V.I. 491, 508-09 (V.I. 2016) (citing *Thomas v. People*, 63 V.I. 595, 606 n.4 (V.I. 2015), *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971), and *Horton v. California*, 496 U.S. 128, 136 (1990)). A seizure in plain view is proper only if law enforcement officers did not violate the Fourth Amendment protection by arriving at the place where the evidence could be plainly and clearly be viewed. *See e.g.*, *Horton*, 496 U.S. at 136, *Kennedy v. King*, 563 U.S. 452, 462-63 (2011).

¶29 Here, law enforcement officers were conducting a compliance check on Heath who was under court ordered house arrest. The evidence presented informs that Virgin Islands law enforcement agents proceeded to the rear of the residence after knocking repeatedly on the front door and announcing themselves and waiting for approximately three to five minutes without receiving an answer or response at the front door. Officer Fraser-Jacobs testified that she saw a light outside in the back of the residence and observed movements inside the residence. Detective Matthews then instructed Officer Fraser-Jacobs to walk to the back of the residence to investigate whether someone could be present and contacted there. Upon arriving in the rear of the residence, the officer saw in plain view multiple marijuana plants, numbering more than 100 plants being

grown with the assistance of an elaborate lighting system. Because the officers were legally on the premises and the marijuana was in plain view of where the officers had a right to be, the marijuana was validly seized in compliance with the requirements of the Fourth Amendment. Moreover, the conduct of law enforcement officers was harmonious and consistent with the scope of their original purpose, which was to effectuate Operation Curfew compliance by contacting people on pretrial house arrest. Accordingly, Virgin Islands law enforcement officers did not interfere with Heath's privacy interests when they, in good faith, went unimpeded to the back of Heath's residence in attempting to contact Heath who was residing at 176 Estate Hannah's Rest. *See United States v. Anderson*, 552, F.2d 1296, 1300 (8th Cir. 1977) (observing that law enforcement officers must sometimes move away from the front door when attempting to contact the occupants of the residence).

### d. *Plain View Doctrine Applies to Marijuana, Ammunition and Firearms Found Inside the Heath's Residence*

¶30    Heath argues that the marijuana, ammunition, and guns found in his residence should be suppressed because they are the fruit of an illegal search in violation of his Fourth Amendment rights. The People argue that the marijuana was lawfully seized based on the plain view doctrine and based upon Heath's and Berkley's consent to search the residence. (Appellee's Br. 38-39.)

¶31    "It is well-established that under certain circumstances, the police may seize evidence in plain view without a warrant." *Coolidge*, 403 U.S. at 465. The U.S. Supreme Court has held that for the plain view exception to the Fourth Amendment's warrant requirement to apply, the police must not "violate the Fourth Amendment by arriving at the [place] in which the evidence could be plainly viewed." *Horton*, 496 U.S. at 136.

¶32     Here, after Berkley signed the consent form and gave law enforcement personnel consent to enter the residence, they were lawfully admitted inside the residence. Further, the evidence in the court proceedings confirmed that while Detective Walcott was leaving the room Heath earlier identified as his room, Walcott smelled the odor of marijuana emanating from directly across the hallway, which displayed an open bag with marijuana on top of a table. Detective Walcott then entered the room and seized the marijuana and, after looking around briefly, found several guns and ammunition under a mattress in that room. Because Berkley had given the officers oral and written consent to search the residence, the guns and ammunition and the marijuana located in plain view were not seized in violation of Heath's Fourth Amendment rights because it was authorized by Berkley's consent. *See United States v. Starr*, 533 F.3d 985, 996 (8th Cir. 2008) (interpreting a written consent as an unqualified consent to search an entire residence, where the defendant was present during the full search of his residence but remained silent and made no attempt to impede law enforcement officers or to communicate to them that he believed they exceeded the scope of their consensual search.)

### d.     *Illegally Obtained Confession*

¶33     Heath argues that his confession was illegally obtained (Appellant's Br. 26-27) and that his right to counsel was violated. (Appellant's Br. 27-30). The People dispute Heath's contention, arguing that he initiated the conversation that led to his spontaneous confession, and he further waived his constitutional rights by memorializing a signed written statement of his confession. (Appellees' Br. 30-44.)

¶34     *Miranda* requires that prior to a law enforcement official's questioning of a defendant in custody, he must be advised of his Fifth Amendment rights. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). An individual is in custody or subject to custodial interrogation when law enforcement

officials initiate questioning after the individual is taken into custody or deprived of his or her freedom of movement to leave the immediate area. *Id.* at 444. Concomitantly, interrogation is present in "conduct intentionally designed to evoke a confession . . . as well as any conduct an officer should reasonably have foreseen would elicit an inculpatory response." *United States v. Bonner*, 469 Fed. Appx. 119, 126 (3d Cir. 2012) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). Accordingly, the suspect must be informed of his or her rights, including the right to remain silent and the right to have an attorney present during interrogation. *Miranda*, 384 U.S. at 444. In considering this right, a waiver or "[a]ny statement given freely and voluntarily without any compelling influence, is of course, admissible into evidence . . . [and] volunteered statements of any kind are not barred by the Fifth Amendment." *Blyden v. People*, 53 V.I. 637, 662–64 (V.I. 2010) (quoting *Miranda*, 384 U.S. at 478). It is well-established that "a suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police." *Blyden*, 53 V.I. at 662–64 (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 388-89 (2010)). "[A] spontaneous utterance, not prompted by a police interrogation, made by a suspect who is plainly in custody is admissible even if the suspect has not waived his Miranda rights." 53 V.I. at 662; *see also Miranda*, 384 U.S. at 478.

¶35 Here, Heath was arrested after the ammunition and contraband were found in his residence. Several of the officers testified that they were not sure whether Heath was advised of his *Miranda* rights after he was arrested. Nevertheless, the evidence discloses that Heath was advised of his *Miranda* rights when he arrived at the police station. However, Heath declined to sign the advice of rights form; therefore, Virgin Islands law enforcement personnel did not interrogate or question Heath. Subsequently, Detective Moses Francis ("Francis") provided evidence in the form of

testimony that he was assisting Detective Joseph to book and transport Heath to the Bureau of Corrections ("BOC"), during which Heath asked Joseph if his sister was involved in the investigation. Francis testified that Joseph told Heath that his sister would be investigated in reference to the ammunition and firearms found in the residence. Heath then stated that he did not want his sister to be involved because everything in the house belonged to him and his uncle. Francis testified that Detective Joseph asked Heath to reduce his confession statement to writing and he complied. "Confessions remain a proper element in law enforcement [and a]ny statement given freely and voluntarily without any compelling influences, is of course, admissible in evidence." *Innis*, 446 U.S. at 299-300. Accordingly, contrary to Heath's argument, there was no violation of his Fifth or Sixth Amendment rights in this case because Heath was timely advised of his *Miranda* rights. Heath's confession was obviously spontaneous and not the product of custodial interrogation by law enforcement officers. "The special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subject to interrogation." *Castillo v. People*, 59 V.I. 240, 266 (V.I. 2013) (quoting *Innis*, 446 U.S. at 300). The trial record discloses that Heath voluntarily, knowingly and without any urging by the officers offered the statement to the officers, which is not a violation of his Fifth Amendment right to remain silent, because it was voluntarily made and not the result of custodial interrogation. Because there was no custodial interrogation of Heath when he confessed to the officers while he was being transported to the BOC, there was absolutely no violation of his Fifth Amendment rights.

¶36 Furthermore, there was no violation of Heath's Sixth Amendment rights. The Sixth Amendment of the United States Constitution, applicable to the Virgin Islands, assures the defendant of the assistance of counsel in all criminal proceedings. *See* U.S. CONST. amend. VI.

The questioning or interrogation of a defendant in custody must cease if the defendant in custody requests a lawyer. *Miranda*, 384 U.S. at 444-45. The trial evidence confirms that Heath was advised of his *Miranda* rights before he was transported to the BOC. Importantly, because there is no evidence in the record that Heath requested a lawyer, after he was advised of his Miranda rights, and therefore he waived his Sixth Amendment rights when he confessed orally and in writing that the property and personal items in the house belonged to him and his uncle.

### A. There was Sufficient Evidence to Convict Heath of All the Counts in the Amended Information.

¶37 Heath argues that was is insufficient evidence to sustain his convictions for unauthorized possession of a firearm in violation of 14 V.I.C. § 2253(a), unauthorized possession of ammunition in violation of 14 V.I.C. § 2256(a), and for his failure to report firearms obtained outside or brought into the Virgin Islands in violation of violation of 23 V.I.C. § 470(a). We conclude there was sufficient evidence for a reasonable jury to find beyond a reasonable doubt the elements of each of the crimes for which Heath was convicted.

### i. *Unauthorized Possession of a Firearm.*

¶38 Heath was charged in the amended information in counts one through five with unauthorized possession of a firearm after law enforcement officials seized the following from his residence: (1) a Ruger .357 magnum revolver model Security Six, (2) a SWD 380 auto semi-automatic pistol model M12, (3) a Phoenix Arms .25 caliber semi-automatic pistol, model HP25A, (4) a Norinco Sporter 7.62 x 30 semi-automatic rifle model MAK 90, and (5) a Mossberg 12 gauge semi-automatic shotgun model 500. On appeal, Heath challenges the legal and factual sufficiency of the evidence presented in support of his convictions for unauthorized possession of a firearm in violation of 14 V.I.C. § 2253(a). Alternatively, the People argue that

the Superior Court properly denied Heath's motion for judgment of acquittal or in the alternative a new trial because—viewing the evidence in the light most favorable to the People—a reasonable jury could have found Heath guilty beyond a reasonable doubt of the charges in the amended information. (Appellee's Br. 38-40.) Based on the evidence presented, the jury properly convicted Heath of the charges in the amended information.

¶39　In reviewing Heath's challenge to the sufficiency of the evidence, "this Court applies a 'particularly deferential standard of review' . . . and will affirm the verdict so long as the evidence, when viewed in the light most favorable to the People—including the benefit of all reasonable inferences—would allow a rational jury to find all elements of each offense proven beyond a reasonable doubt." *Ponce v. People*, 72 V.I. 828, 834 (V.I. 2020) (quoting *James v. People*, 60 V.I. 311, 317 (V.I. 2013)); *see also Fahie v. People*, 62 V.I. 625, 630 (V.I. 2015), *Viera v. People*, 71 V.I. 67 679 (V.I. 2019); *McIntosh v. People*, 57 V.I. 669, 678 (V.I. 2012).

¶40　Title 14 section 2253(a) of the Virgin Islands Code, which criminalizes the unlawful possession of a firearm, specifically states that "whoever, unless otherwise authorized by law, has, possesses, bears, transports or carries either, actually or constructively, openly or concealed any firearm . . . loaded or unloaded, may be arrested." To prove unauthorized possession of a firearm, the People were required to prove that Heath was not authorized to possess a firearm, and that Heath knowingly possessed, either actually or constructively, openly or concealed, a firearm. In the instructions to the jury, the Superior Court defined "possession" and distinguished between "actual and constructive possession." Constructive possession, as used in the statute, means "having the power and the intention at any given time to exercise dominion and control over the firearm either directly or through another person." 14 V.I.C. § 2253(d)(5). Based on the statute's definition, the Superior Court also instructed the jury that "constructive possession means having

the power and intention at any given time to exercise dominion or actual control over the firearm, either directly or through another person." (J.A.498-99.), *see also* 4 V.I.C. § 2253(d)(5). The Superior Court further instructed the jury that a firearm is "any device by whatever name known, capable of discharging ammunition by means of gas generated from an explosive composition, including any air gas or spring gun or any 'BB' pistols or 'BB' guns that have been adapted or modified to discharge projectiles as a firearm." 23 V.I.C. § 451(f).

¶41    Here, there was sufficient evidence for a rational jury to find beyond a reasonable doubt that Heath was guilty of unauthorized possession of a firearm. To prove the elements necessary for conviction of unauthorized possession of a firearm, the People had the burden of proving that Heath had or possessed the firearms; that the firearms Heath had were operable and that Heath was not authorized to possess them. 14 V.I.C. § 2253(a).

### *Heath possessed firearms.*

¶42    Heath argues that he never possessed the firearms and accordingly that there was insufficient evidence to convict him of the unlawful possession of a firearm pursuant to the statute. Detective Walcott testified during the trial that after Berkley gave law enforcement officers a written consent to search the residence, he entered the residence and stood in the hallway next to Heath, who was shirtless and only wearing a pair of pants and also standing next to a Superior Court Marshal. Walcott testified that he asked Heath which room was his and Heath pointed to the room on the right side of the hallway. Walcott testified that when he searched the room Heath identified as his room he found "pretty much a normal room with just woman's [sic] clothing and shoes [and] appears to be a female occupying the room but that there was no indication in that specific room that a male individual was occupying it." (J.A. 216.) Walcott testified that after he searched the room containing the women's clothing, he returned to the hallway where Heath was

standing shirtless with the Superior Court Marshal and looked directly across from the hallway into another room and saw marijuana on top of the table in that room. Walcott further testified that Heath admitted and acknowledged that he owned the marijuana on the table and that he had just smoked a joint. Walcott then testified that he asked Heath who owned the room with the marijuana on the table, and that Heath said he did not know. Detective Walcott further testified that he continued to search the bedroom in which he found the marijuana on top of the table and found three firearms when he lifted the mattress on the bed. Walcott's testimony revealed that he continued to search the room and also found ammunition in the top of the closet in that room. Importantly, Walcott also testified that he found court documents bearing Quanza Heath's name in that room.

¶43 Detective Walcott then testified that he proceeded to search the third bedroom, which was immediately next to the room in which he found the guns, ammunition, marijuana and court documents with Quanza Heath's name on them. Walcott further testified that the third room resembled a storage room at the residence because it was unoccupied and had many items strewn across the bed and floor with very little room to walk. Walcott testified that he also searched that room and found two firearms, one under the mattress on the bed and the other in a closet. Additionally, Walcott's testimony revealed that he also found a bullet proof vest, a firearm scope and ammunition in the same room.

¶44 The foregoing evidence establishes that Heath possessed the firearms. Constructive possession as used in the statute means "having the power and the intention at any given time to exercise dominion and control over the firearm either directly or through another person." 14 V.I.C. § 2253(d)(5). In this case, the evidence, albeit circumstantial, reveals that some of the guns and marijuana were found in the bedroom that was solely occupied by Heath, while others were

found in another adjacent bedroom that was apparently used as a storage room and to which he and the other occupants of 176 Estate Hannah's Rest had free access. The bedroom in which some of the weapons, ammunition, and the bag of marijuana were found also contained official court documents with the name "Quanza Heath" inscribed on them. Although Heath did not admit to occupying this particular room, it is important to note that when he was arrested and was given permission to put on a t-shirt before being transported to the police station, he retrieved his t-shirt from that bedroom. This evidence, considered along with the surrounding circumstances, was sufficient for a reasonable jury to conclude beyond a reasonable doubt that this same room was occupied by Heath and that, accordingly, he had the intention and the power at any given time to directly exercise dominion and control over the firearms that were located therein. *See e.g. United States. v. Bonham*, 477 F.2d 1137, 1138 (3d Cir. 1973) (noting that "[w]hen a person is the sole occupant of a room and has the right to exclude all others from it, it may logically be inferred that he has knowing dominion and control over objects so situated in his room that he is likely to be aware of their presence"). In addition, since Heath had free access to the adjacent bedroom, apparently used for storage, he had the same intention and power to directly exercise dominion and control over the firearms that were located there.

¶45    Reynold D'Souza ("D'Souza"), employed for 10 years by the VIPD as a firearm and tool mark examiner, also testified at Heath's trial. As a firearm and toolmark examiner, D'Souza's tested firearms for operability and compared bullets and cartridge cases to determine if they were fired from a particular firearm. D'Souza offered undisputed testimony that he tested for operability the Ruger .357 revolver, the M12 .380 auto, the Phoenix Arms .25 auto and the Norinco 7.26 caliber rifle, as well as the Mossberg shotgun, and all the firearms were deemed operable and none of the firearms was manufactured in the Virgin Islands. (See J.A. 321—29.) D'Souza also testified

that he examined all the ammunition for each firearm, and his examination revealed that they were all "live" cartridges. (J.A. 329.)

¶46 During Heath's trial Elsworth Jones ("Jones"), a ten-year employee and supervisor in the Firearms Division of the VIPD, testified that he had the responsibility to license, issue and register firearms and ammunition to the public and that he was the caretaker and custodian of the firearm records. Jones testified that he consulted the records for issuance of a firearm license to Heath. After conducting a search of the firearms record for both the St. Thomas and the St. Croix Districts, Jones determined that Heath did not have a license to possess a firearm in the Virgin Islands on December 19, 2015, the date the firearms and ammunition were discovered in the 176 Estate Hannah's Rest residence. Jones also produced two absence-of-entry forms that were admitted into evidence.

¶47 Consequently, there was sufficient evidence for a reasonable and unbiased jury to convict Heath of the offense of unauthorized possession of a firearms in counts one through five and to support his conviction of the same. *See Cascen v. People*, 60 V.I. 392, 409 (V.I. 2014).

### *i. Unauthorized Possession or Sale of Ammunition*

¶48 Heath also argues that there is insufficient evidence to support his conviction of unauthorized possession of ammunition in violation of 14 V.I.C. § 2256(a), as charged in counts six, seven, eight, nine and ten of the amended information.[4] The People argue in opposition that

---

[4] Heath was charged with unauthorized possession of various forms of live firearm ammunition in the amended information as follows:

Count 6:

    Winchester-USA 38 SPL +P cartridge loaded with silver tip hollow point bullet, and/or 2 Top Brass 357 Mag cartridge loaded with lead flat nose bullet, and/or 2 CBC 357 Mag cartridge loaded with semi jacketed hollo point bullet, in violation of 14 V.I.C. § 2256(a).

there was sufficient evidence provided at trial to support Heath's conviction of unauthorized

possession of ammunition.

¶49     Title 14 section 2256(a) of the Virgin Islands Code states that:

> **(a)** Any person who is not:
>> **(1)** a licensed firearms or ammunition dealer; or
>> **(2)** officer, agent or employee of the Virgin Islands or the
> United States, on duty and acting within the scope of his duties; or
>> **(3)** holder of a valid firearms license for the same firearm
> gauge or caliber ammunition of the firearm indicated on such
> license; and
>> **(4)** who possesses, sells, purchases, manufactures,
> advertises for sale, or uses any firearm ammunition is guilty
> subject to imprisonment for up to seven years or a fine not more
> than $10,000[, or] to both fine and imprison[ment].

¶50     To convict Heath of unauthorized possession of ammunition, the People were required to

prove beyond a reasonable doubt that Heath possessed or used firearm ammunition, and that at the

time of such possession or use, he was neither a licensed firearm or ammunition dealer; nor an

officer, agent or employee of the Virgin Islands or the United States, then on duty and acting within

---

Count 7:

   1 Winchester USA .380 Auto cartridge loaded with full metal jacketed round nose bullet and/or 3 Federal .380 Auto cartridge loaded with Hydra Shock bullet, and/or 10 PMC .38 cartridge loaded in full metal jacketed round nose bullet, and/or 14 WEN .380 Auto cartridge loaded with full metal jacket round nose bullet, in violation of 14 V.I.C. § 2256(a).

Count 8:

   7 CCI .25 Auto cartridge loaded with full metal jacketed round nose bullet, and/or 36 .25 Auto cartridge loaded with full metal jacketed round nose bullet and/or 31 REM .22 LR cartridges loaded with lead round nose bullet, in violation of 14 V.I.C. § 2256(a).

Count 9:

   1 Winchester USA 7.62x39 cartridge loaded with full metal jacketed bullet, and/or 4 VYMPEL (Russian) 7.62x39 cartridges loaded in full metal jacketed bullet, and/or 6 Tulammo (Russian) 7.62x39 cartridges loaded in full metal jacketed bullet, in violation of 14 V.I.C. § 2256(a).

Count 10:

   2 Winchester USA 12 GA shot gun cartridges loaded with 00 buck pellets, and/or 6 Winchester USA 12 GA shot gun cartridges loaded with unknown pellets, in violation of 14 V.I.C. § 2256(a).

the scope of his duties; nor the holder of a valid firearms license for the same firearm gauge or caliber ammunition of the firearm indicated on such license. "Firearm ammunition means any self-contained cartridge or shotgun shell by whatever name known, which is designed to be used or adaptable for use in a firearm." 14 V.I.C. § 2256(c)(2).

¶51 Sufficient evidence is present in the record to support Heath's conviction of unauthorized possession or sale of ammunition. Here, we have already concluded that a reasonable jury could find beyond a reasonable doubt that Heath constructively possessed the firearms and ammunition recovered from 176 Estate Hannah's Rest residence. In addition, Jones' testimony and the related records admitted into evidence during his testimony established that Heath did not have a license to possess a firearm in the Virgin Islands on December 19, 2015, the date the ammunition was discovered in the 176 Estate Hannah's Rest residence. Accordingly, the evidence established that the exemption afforded under 14 V.I.C. § 2256(a)(3) could not apply to Heath. Heath also failed to satisfy his burden to prove that, at the time the ammunition was recovered, he was either a licensed firearms or ammunition dealer within the intendment of 14 V.I.C. § 2256(a)(1) or an officer, agent or employee of the Virgin Islands or the United States, then on duty and acting within the scope of his duties within the intendment of 14 V.I.C. § 2256(a)(2). Indeed, Heath offered no argument or evidence regarding any conceivable exemption from the statute. *See* 14 V.I.C. § 2256(f) (unambiguously providing that "[t]he defendant shall have the burden of proving . . . an exemption" provided by 14 V.I.C. § 2256, and that "[a]n information based upon a violation of this section need not negate any exemption . . .contained" in the statute); *Roberts v. People*, 76 V.I. 555, 573 (V.I. 2022) (observing that "to the extent that 14 V.I.C. § 2256(a)(1), (a)(2), and (a)(3) provide exemptions from the punishments available under [14 V.I.C. § 2256], it is the defendant who must establish a prima facie case of entitlement to th[os]e exemptions").

Accordingly, there was sufficient evidence for a reasonable jury to find Heath guilty beyond a

reasonable doubt of possession or sale of ammunition without authorization in violation

of 14 V.I.C. § 2256(a) in counts six, seven, eight, nine, and ten of the amended information. *See*

*also Viera*, 71 V.I. at 686-87 (observing that 14 V.I.C. § 2256 was amended in 2010 to state the

conditions under which possession of ammunition is and is not authorized in the Virgin Islands).

### ii. Failure to Report Firearms Obtained Outside or Brought into the Virgin Islands.

¶52     Heath argues that there is insufficient evidence to support his conviction of failure to report

firearms obtained outside or brought into the Virgin Islands in violation of Title 23 section 470(a)

of the Virgin Islands Code. The People counter that the People met its burden beyond a reasonable

doubt, by providing evidence that the firearms were transported to the Virgin Islands. (Appellee's

Br. 40.)

¶53     Title 23 section 470(a) of the Virgin Islands Code states that:

> Any person upon entering the Virgin Islands and bringing any
> firearm or ammunition shall declare all firearms and ammunition
> to the Commissioner or the Commissioner's designee immediately
> upon arrival to any port of entry and shall furnish a complete
> description of all firearms and ammunition brought into the Virgin
> Islands. The person shall also furnish the person's own name,
> address, date of birth and occupation.

¶54     To sustain a conviction under 23 V.I.C. § 470(a), "there must be evidence that a person

failed to immediately report the purchasing or obtaining of a firearm or ammunition." *Velazquez*

*v. People*, 65 V.I. 312, 320 (V.I. 2016) (quoting *Sonson v. People*, 59 V.I. 50, 597 (V.I. 2012)).

The Superior Court instructed the jury that in order to find Heath guilty of failure to report firearms

purchased outside or brought into the Virgin Islands in violation of 23 V.I.C. § 470(a), the People

were required to prove beyond a reasonable doubt that Heath is not a licensed dealer of firearms,

that he purchased or obtained firearms and/or ammunition from within or outside the U.S. Virgin Islands, and that he failed to immediately report such receipt in writing or in person to the Police Commissioner of the Virgin Islands, and that Heath's failure occurred on or about December 19, 2015, the day when the firearms and ammunition were recovered from the 176 Estate Hannah's Rest residence. Accordingly, the jury was tasked to determine whether Heath had those recovered firearms in his possession and failed to immediately report such possession to the Police Commissioner. *See* 23 V.I.C. § 470(a).

¶55 We have already concluded that the evidence was sufficient to prove that Heath possessed the firearms and ammunition in question. During the trial, the People established the models and manufacturers of the firearms that were recovered from the 176 Estate Hannah's Rest residence and provided evidence that these firearms were not made in the Virgin Islands. We therefore turn our review to the complete record to determine whether Heath furnished the Police Commissioner with his name, address, date of birth, and occupation with a complete description of all of the firearms and ammunition in his possession on or before December 19, 2015. A thorough and exhaustive review reveals the lack of any such evidence. Viewing this evidence in the light most favorable to the People, a rational jury could conclude beyond a reasonable doubt that—because these firearms are not manufactured in the Virgin Islands—Heath either obtained the firearms outside of, or brought them into, the Virgin Islands, and then simply did not report possession of those firearms and ammunition to the Police Commissioner or a designee thereof. Accordingly, there was sufficient evidence to find Heath guilty beyond a reasonable doubt of failure to report firearms obtained outside or brought into the Virgin Islands in violation of 23 V.I.C. § 470(a), and therefore, this argument by the defendant fails on appeal.

### B. Heath's Argument that his Case Should be Dismissed on Speedy Trial Grounds is Waived.

¶56    The extent of Heath's argument on appeal that his case should have been dismissed on speedy trial grounds consists of one sentence: "The case should have been dismissed on violation of speedy trial grounds." (Appellant's Br. 34.) The People counter that Heath has failed to provide any analysis of the speedy trial issue he raised, and therefore the issue has been waived, pursuant to Rules 4(h) and 22(m) of this Court. (Appellee's Br.41-42.)

¶57    We agree with the People. The rules of this Court require that an argument be "fairly presented to the Superior Court [in order to] be presented for review on appeal."[5] Clearly, Heath presented this issue to the Superior Court in his March 5, 2019 motion to dismiss, in which he devoted almost all of its six pages to his argument that the case against Heath must be dismissed for failure to timely prosecute, in violation of his Sixth Amendment right to a speedy trial. That motion featured citations to numerous cases, including *Barker v. Wingo*, 407 U.S. 514 (1972) and other authorities that purportedly support his argument. Appellant acknowledges in his brief that the Superior Court denied his motion, after consideration of his argument. (Appellant's Br. 10.) Therefore, appellant's argument that the case against him should have been dismissed on Sixth Amendment grounds was "fairly presented" to the Superior Court within the intendment of Rule 4(h) of the Virgin Islands Rules of Appellate Procedure and thus adequately preserved for appeal.

¶58    However, the Virgin Islands Rules of Appellate Procedure, and our precedent, require more than just adequate preservation of an argument for it to be considered on appeal. Indeed, Rule 22(m) of these rules requires that a sufficiently *preserved* argument also be adequately *presented* to this Court on appeal, in order for it to be considered. A preserved argument is adequately

---

[5] V.I.R. App. P. 4(h).

presented when it is set out in an appellate brief and "contain[s] the contentions" of the party filing the brief "with respect to each of the issues presented, and the reasons therefor, with citations to the authorities, statutes, and parts of the record relied on" to support it. V.I.R APP. P. 22(a)(5) (requirement for appellant's argument in the opening brief); V.I. R. APP. P. 22(b) (brief of appellee "shall conform to the requirements of paragraph[s] (a)(1)-(6)" of Rule 22); V.I. R. APP. P. 22(i) (specifying how citations to legal authorities are to be made in appellate briefs).

¶59    It is in the presentation aspect, rather than the preservation aspect, that the appellant's brief is insufficient. An argument consisting of a single sentence, lacking citation to any supporting authority whatsoever, and providing no references to facts in the record on appeal that are relied upon for support, clearly does not comply with the obligation imposed by Rule 22(a)(5). Nor does it provide the information contemplated by Rule 22(i). Indeed, this Court has repeatedly held that such undeveloped arguments need not be considered on appeal. *See, e.g., Prosser v. Public Servs. Comm'n of the U.S.V.I.*, 56 V.I. 391, 400 n.8 (V.I. 2012) (regarding a claim of a purported procedural due process violation in an appellate brief that is limited to a single sentence and that lacks any supporting citations, observing that "[g]enerally, appellate courts do not consider issues that are identified but not supported"); *Construction Technicians v. Zurich American Insurance Co.*, 61 V.I. 153, 162 (V.I. 2014) (mere mentions of the "right to a fair trial, right of confrontation, and right to due process" appearing in the conclusion of a brief were deemed to be "legal ideas [that] were never developed into complete, supported arguments presented to the Court," and that failure to develop and adequately present those issues "forecloses any discussion" of them on appeal). Importantly, Rule 22(m) provides the Court with the express authority to deem "[i]ssues that . . . are only adverted to in a perfunctory manner or unsupported by argument and citation to legal authority . . . waived for purposes of appeal." To be sure, that provision also provides that

"the Court, at its option, may notice an error not [adequately] presented that affects substantial rights." *Id.* But on the record presented, we decline to exercise the option to notice Heath's adequately preserved, but woefully undeveloped and insufficiently presented argument concerning Heath's Sixth Amendment right to a speedy trial, and instead deem it waived pursuant to Rule 22(m). *See Percival v. People*, 62 V.I. 477, 490 (V.I. 2015) ("Since [appellant's] substantive argument on th[e] issue amounts to a single sentence, unsupported by any citation to legal authority supporting th[e] argument, the issue is waived.") (citing former V.I. S. CT. R. 22 (m), the predecessor of current V.I. R. APP. P. 22(m)). This is clearly a textbook example of what the rules of this Court, and its precedent, actively discourage.

### III. CONCLUSION

¶60    For all the foregoing reasons, we affirm the Superior Court's January 24, 2020 memorandum opinion and order.

**DATED this 27th day of March, 2024.**

**IVE ARLINGTON SWAN**
**Associate Justice**

**ATTEST**

**VERONICA J. HANDY, ESQ.**
**Clerk of the Court**

By: _____
     **Deputy Clerk**

Dated: March 27, 2024